**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Raul LUIS–GONZALEZ, Leonardo Espinosa, Oswaldo Carbonell, Marcelian Torres-Gomez, Jr., Defendants-Appellants.**

**No. 82–5613.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 21, 1983.

Mark A. Pizzo, Asst. Federal Public Defender, Tampa, Fla., for Carbonell.

Robert A. Herce, Herce & Martinez, Tampa, Fla., for Gomez.

Geoffrey C. Fleck, Rodney W. Morgan, Sp. Asst. U.S. Atty., Tampa, Fla., for Luis-Gonzalez and Espinosa.

Before TJOFLAT and HILL, Circuit Judges, and SIMPSON, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

Raul-Luis Gonzalez, Leonardo Espinosa, Marcelian Torres-Gomez, Jr., and Oswaldo Carbonell were charged in a five count indictment as a result of their arrest in the Gulf of Mexico aboard a vessel laden with 15,000 pounds of marijuana. Counts One through Four of the indictment charged the defendants with violations of 21 U.S.C. § 955a(a)–(d) and Count Five charged a violation of 21 U.S.C. § 846. The defendants were found guilty on all counts and appeal their convictions. For the reasons set forth below, we affirm.

## FACTS

On December 14, 1981, a Coast Guard cutter, while on routine patrol in the Gulf of Mexico west of Fort Myers Beach, Florida, spotted on radar and subsequently approached the OCEAN QUEEN, a 65 foot shrimp trawler. At the time, the OCEAN QUEEN was anchored and located 11.5 nautical miles from the shore of the United States. A Coast Guard officer noticed the shrimp trawler was in an obvious state of disrepair, the pumps which were hanging over its side were continuously pumping water, the doors used to lower nets for shrimping were missing, one out-rigger was bent, and the vessel's water line was not straight. Two individuals, later identified as the master, James Henry Wilson, and Orlando Russill-Ponce, were on the stern of the OCEAN QUEEN when the Coast Guard cutter approached.[1] Wilson, in response to questioning by the Coast Guard, responded that the vessel was not in any danger, that there were two other individuals on board besides himself, and that the vessel's last port of call was Key West, Florida. Wilson also explained that the shrimp doors had been caught on a wreck and lost and that

---

1. Wilson was charged in the same indictment as the appellants but pled guilty pursuant to a plea agreement to one count of the indictment and appeared at trial as a government witness. Ponce was also charged in the same indictment and was convicted on all five counts. He filed a notice of desire not to appeal and consequently does not appear in this appeal.

replacements were expected within a day or two.

The Coast Guard decided to conduct a safety boarding and directed the Master to muster his crew on the afterdeck. Wilson obeyed, producing in addition to Ponce, defendant Oswaldo Carbonell. Thereupon, the OCEAN QUEEN was boarded and the vessel's documents were requested. As a Coast Guard officer followed Wilson to the wheelhouse to retrieve the documents, the officer noticed other figures moving around the cabin and drew his weapon. The officer ordered the figures in the cabin to come out, whereupon defendants Raul Luis-Gonzalez and Leonardo Espinosa exited from the cabin. One other person remained in the cabin. Eventually the remaining individual, defendant Marcelian Torres-Gomez, exited when a rifle was pointed into the cabin.

While the Coast Guard was attempting to round up the crew, another Coast Guardsman opened the cargo hold to check the main-beam identification number. In the hold he observed marijuana wrapped in black plastic bags. After each of the crew members was handcuffed, frisked, and searched, a safety inspection was conducted of the OCEAN QUEEN to determine its seaworthiness for transit to the Coast Guard station at Fort Myers Beach. Numerous bundles of marijuana wrapped in black plastic were found in the hold. The total amount of marijuana on board the vessel was later determined to be 15,391 pounds.

During a search of the OCEAN QUEEN, the Coast Guard found a VHF radio, a loran navigational device, a citizen's band radio, and five navigational charts. One chart was a loran-c navigational chart of the west coast of Florida from Tampa Bay to Dry Tortugas which contained handwritten navigational markings, loran numbers, and the name "Tony." Another loran-c chart depicted the Gulf of Mexico and the Caribbean Sea, including the West Indies, and contained a handmade navigational tract from South America to the Coast of Florida. Additionally, various long-range radio equipment was discovered in the Captain's quarters. There existed no indication that

the OCEAN QUEEN had been recently used in shrimping or fishing as its fishing equipment was in disrepair and the vessel carried little or no ice with which to store a catch.

After the crew of the OCEAN QUEEN was taken ashore, defendant Gomez was advised of his constitutional rights and questioned by government agents. Gomez stated that he had been on board the vessel approximately one month and that when he joined the vessel as crew, the captain and two other people were on board. He said he helped load the boat with marijuana and was going to be paid 50,000 Colombian pesos to work on the boat from Colombia to the United States. Gomez also admitted that he understood it was against the law to bring marijuana to the United States.

At trial, the government offered the testimony of Wilson, the master of the OCEAN QUEEN. Wilson explained that in early June of 1981 he had been approached by a Cuban-American named Thomas who offered Wilson $10,000 to transport the OCEAN QUEEN from Key West to Aruba. Wilson agreed and was taken to the docks where he inspected the boat and received nautical charts from a man named Tony. Wilson and Thomas then went to a Holiday Inn in Key West where they met defendants Espinosa and Gonzalez and a man named Alexis. Wilson, Espinosa, Gonzalez, and Alexis returned to the boat and began to proceed toward the Yucatan but the seas were too high for the vessel so they returned to the dock. Espinosa, Gonzalez, and Alexis telephoned Thomas to inform him of the problem. The boat was repaired and strengthened and the four men set out again, arriving in Aruba eight days later.

While in Aruba, the vessel was docked for repairs. During this time, Tony and his wife joined the crew. Tony left after two or three days and defendant Gomez joined the crew as a "second captain" bringing with him a black attache case containing a chart and stencil for navigation. After the vessel was repaired and a stronger radio was installed, Wilson, Gomez, Espinosa, and Gonzalez went to Cartagena, Colombia, and

eventually to Turbo, Colombia. In Turbo, the OCEAN QUEEN ran aground and was apprehended by the police who said they would hold the boat until they were paid $20,000. Espinosa and Gonzalez used the boat radios to speak to someone in Miami about the situation.[2] While in Turbo, a man named Montenello brought three small packages of marijuana, which he gave to Gonzalez and Espinosa, and indicated that the marijuana was samples of what Montenello intended to bring out of the mountains and load on the boat. The OCEAN QUEEN was ultimately loaded with black plastic packages of marijuana which sometimes broke and were repaired by Espinosa and Gonzalez. Espinosa, Gonzalez, Gomez, and various Colombians, including Ponce and defendant Carbonell, helped load the vessel.

The OCEAN QUEEN, loaded with marijuana, departed for the United States with Wilson, Espinosa, Gonzalez, Gomez, Carbonell, and Ponce as crew. When the OCEAN QUEEN began to leak, Espinosa and Gonzalez used the radio to contact Tony in Florida and an airplane was dispatched to drop pumps to the vessel. During the course of the voyage, Ponce removed some marijuana from the hold. While the hold was open, the odor of marijuana could be smelled aboard the vessel.

As the OCEAN QUEEN approached the United States, Gonzalez gave Wilson a chart and a piece of paper noting three landing sites off the coast of Florida where the marijuana was to be unloaded. By radio, Tony directed that the OCEAN QUEEN go to one site where it was met by an airplane. After the plane left, Tony arrived in a boat from Key West. From the boat on which Tony arrived, the OCEAN QUEEN obtained a new anchor, line, fuel, and groceries. At Tony's direction, Espinosa and Gonzalez obtained a sample of marijuana from the hold and gave it to Tony. Tony, in turn, gave the sample to two other people on his boat.[3] Thereupon, Tony instructed Espinosa that

the OCEAN QUEEN should be brought to an island near Sanibel Island, Florida. According to Wilson, Tony told the crew that "they" had bought an island near Sanibel and that members of the Sheriff's Department would come out by boat, get the marijuana, and "take it in." Espinosa told Wilson that the OCEAN QUEEN was to be met by a pick-up boat named the LADY JO.

Later, instructions were received from Tony to bring the OCEAN QUEEN on a Sunday afternoon to rendezvous with the LADY JO. When the LADY JO could not be found, Tony radioed instructions to Espinosa to drop the OCEAN QUEEN's anchor. It was shortly thereafter that the Coast Guard cutter approached and boarded the OCEAN QUEEN.

## I SUFFICIENCY OF THE EVIDENCE

Defendants/appellants challenge the sufficiency of the evidence to support their convictions for conspiracy to possess marijuana with intent to distribute it within the United States. Appellants maintain that the evidence, while it may show a conspiracy to import marijuana into the United States, does not support a conviction for conspiracy to possess with intent to distribute in the United States. They assert that the government merely proved an intent to import a large quantity of marijuana. Relying on *United States v. Rodriguez,* 585 F.2d 1234 (5th Cir.1978), *aff'd,* 612 F.2d 906 (1980) (en banc), *aff'd on other grounds sub nom. Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), and *United States v. Cadena,* 585 F.2d 1252 (5th Cir.1978), appellants contend that participation in a conspiracy to distribute cannot be inferred solely from participation in a conspiracy to import a large quantity of marijuana. The government, on the other hand, argues that the appellants' reliance on *Rodriguez* and *Cadena* is misplaced because subsequent decisions of the former Fifth Circuit hold that once the jury has

---

2. Although the OCEAN QUEEN eventually left Turbo, the record does not indicate whether any money was ever paid to the police to secure release of the vessel.

3. Wilson testified that all of the defendants observed the transactions taking place between Espinosa, Gonzalez, Tony, and the two other unidentified people in the boat.

determined that the defendant was involved in the conspiracy to import contraband, it is entitled to conclude on the basis of the quantity of marijuana imported that the defendant was also a participant in a conspiracy to distribute. *See, e.g., United States v. Mazyak,* 650 F.2d 788 (5th Cir. 1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); *United States v. Mann,* 615 F.2d 668 (5th Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981); *see generally United States v. Michelena-Orovio,* 702 F.2d 496 (5th Cir.) (majority holds that intent to distribute cannot be inferred from the size of the cache and participation in a conspiracy to import; dissent argues that such evidence is sufficient), *reh'g en banc granted,* 706 F.2d 502 (5th Cir.1983). The evidence in the instant case, however, shows far more than the mere seizure of a marijuana laden boat on the high seas. Thus, we need not decide whether a jury can infer a conspiracy to distribute solely from participation in a conspiracy to import a large quantity of marijuana.

■ The standard in reviewing the sufficiency of the evidence is whether, after viewing the evidence and inferences that may be drawn from it in the light most favorable to the government, "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd,* —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). In a conspiracy case, the government must prove that a conspiracy existed, that the accused knew it and, with that knowledge, voluntarily joined it. *United States v. White,* 569 F.2d 263, 267 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978). Participation in the conspiracy need not be proven by direct evidence as circumstantial evidence may support the verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Malatesta,* 590 F.2d 1379, 1381 (5th Cir.) (en banc), *cert. denied,* 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979). Moreover, the government is not required to prove a defendant's knowledge of all of the details of the con-

spiracy or of each of its members, provided the prosecution establishes a defendant's knowledge of the essentials of the conspiracy. *United States v. Alvarez,* 625 F.2d 1196, 1198 (5th Cir.1980) (en banc), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981).

■ Viewing the evidence in the light most favorable to the government, the jury could reasonably infer from the direct and circumstantial evidence the existence of a conspiracy to distribute marijuana in the United States. The term "distribute" is defined in 21 U.S.C. § 802(11) as meaning "to deliver . . . a controlled substance." "Deliver" is defined as "the actual, constructive, or attempted transfer of a controlled substance, whether or not there exists an agency relationship." 21 U.S.C. § 802(8). As set forth above, the defendants' voyage started in Key West and throughout the trip the defendants were in touch with people in Florida for supplies and instructions. The charts on board the OCEAN QUEEN indicated that the ultimate destination of the drug-laden vessel was Florida. When the vessel was near the Florida coast, it was met by a boat from Key West which carried Tony, who instructed one of the appellants where to offload the boat, and two individuals who obtained samples of the marijuana. The vessel eventually dropped anchor within 12 miles of the Florida coast and waited to offload the drugs to individuals who would take it to an island near Sanibel Island. From these facts it is clear that there was sufficient evidence for the jury to find the existence of a conspiracy to distribute marijuana in the United States. *See United States v. Groce,* 682 F.2d 1359, 1365 (11th Cir.1982).

The evidence was also sufficient for the jury to find that all the appellants knew of the conspiracy to distribute and voluntarily joined it. "Under our decisions, participation of crew members in a conspiracy may be inferred from a fairly lengthy voyage, a large quantity of marijuana, and a close relationship between captain and crew which can be inferred from the length of the voyage and the size of the vessel."

*United States v. Ceballos,* 706 F.2d 1198, 1202 (11th Cir.1983). All of the appellants knew of the marijuana on board the OCEAN QUEEN since they all helped load the vessel in Colombia. Although the record does not establish the exact length of the voyage from Turbo to the Florida coast, Wilson indicated that it took about 23 days just to get from Turbo to the Yucatan and an additional indeterminate amount of time to get from Yucatan to the drop location 11.5 miles off the coast of Florida. Furthermore, the vessel was a 65 foot shrimp trawler with a crew of six and 15,000 pounds of marijuana in the hold. In accordance with previous decisions of this circuit, we conclude that a reasonable jury could find a conspiracy to distribute marijuana in the United States and appellants' knowing and voluntary participation in that conspiracy.[4] *See id.* (eight crew members on board a 71-foot vessel with 27,520 pounds of marijuana); *United States v. Liles,* 670 F.2d 989, 992 (11th Cir.) *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982) (three crew members on board 44 foot vessel with 4,800 pounds of marijuana).

 In a related matter, appellants maintain that the trial court erred in failing to grant their requested jury instruction. The requested instruction read as follows:

The government has the burden of proving, beyond a reasonable doubt, that the defendants were members of a conspiracy to distribute over 1,000 pounds of marijuana within the United States. If you find that the defendants were members of some other conspiracy for example, a conspiracy to import marijuana into the United States, and were not members of the *land-based conspiracy* to distribute marijuana once inside the United States, then you must acquit the defendants on Count Five of the Indictment which charges a conspiracy to possess with intent to distribute marijuana in the United States. (emphasis added).

A refusal to deliver a requested jury instruction is reversible error only if the instruction (1) is substantially correct, (2) is not substantially covered by others delivered, and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to present a given defense. *United States v. Stone,* 702 F.2d 1333, 1339 (11th Cir.1983); *Pine v. United States,* 135 F.2d 353, 355 (5th Cir.), *cert. denied,* 320 U.S. 740, 64 S.Ct. 40, 88 L.Ed. 439 (1943). The charge requested in this case is an incorrect statement of the law. The use of the term "land-based" would suggest to the jury that the conspiracy to distribute must exist on the land. The statutes in question do not require that the conspirators operate on-shore. This instruction would have directed the jury that it must find something which is not a necessary element of the crime of conspiracy to distribute marijuana in the United States. Therefore, the trial judge properly refused the requested instruction.

## II MULTIPLE CONVICTIONS UNDER 21 U.S.C. § 955a(a)–(d)

Appellants argue that Counts One through Four, all charging violations of 21

---

**4.** Appellants also contend that the government failed to establish that they possessed the necessary dominion or control over the marijuana to have "possessed" it as charged in counts One through Four of the indictment. The individual appellants do not argue that no other appellant possessed the marijuana during the course of the conspiracy but Carbonell, in an argument adopted by the other appellants, contends that the government failed to prove that Carbonell constructively possessed the contraband. There is no merit to this contention. A conspirator may be found guilty of the substantive act of possession committed by a coconspirator in furtherance of the conspiracy so long as the coconspirator's acts are within the reasonably foreseeable scope of the conspiracy.

*See Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946); *United States v. Hodges,* 606 F.2d 520, 523 (5th Cir.1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980). Sufficient evidence was produced to prove that all of the appellants were participants in a conspiracy to possess with an intent to distribute. A reasonable jury could also conclude from the evidence that the marijuana on the OCEAN QUEEN was possessed by some member or members of the conspiracy. Under *Pinkerton's* vicarious liability theory, the possession of marijuana by any one of the appellants may be attributed to all of the other appellants.

*See United States v. Hodges,* 606 F.2d at 523.

U.S.C. § 955a, are multiplicious in that they subject the defendants to multiple convictions for a single act of misconduct, thus violating the due process and double jeopardy guarantees of the Fifth Amendment.[5] They maintain that nothing in section 955a expressly or impliedly provides for or allows separate convictions under each subsection for a single act of possession of marijuana.

Count I of the indictment charged possession of marijuana aboard a vessel of the United States with intent to distribute, in violation of 21 U.S.C. § 955a(a). Count II charged possession of marijuana on board a vessel with intent to distribute by an American citizen, in violation of 21 U.S.C. § 955a(b). Count III charged possession of marijuana on board a vessel within the custom waters of the United States, in violation of 21 U.S.C. § 955a(c). And Count IV charged possession of marijuana with intent to import it into the United States, in violation of 21 U.S.C. § 955a(d).

█ The starting point for determining whether section 955a authorizes separate convictions under each subsection is the language of the statute. *Albernaz v. United States,* 450 U.S. 333, 336, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981). The rule of statutory construction announced in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), is to be applied to determine whether Congress intended the subsections of 955a to define distinct offenses or whether Congress provided that violations of more than one subsection shall constitute merely one crime. *See Albernaz,* 450 U.S. at 337, 101 S.Ct. at 1141; *Whalen v. United States,* 445 U.S. 684, 691, 100 S.Ct. 1432, 1437, 63 L.Ed.2d 715 (1980). *Blockburger* set forth the following test:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only

one, is whether each provision requires proof of a fact which the other does not. 284 U.S. at 304, 52 S.Ct. at 182.

█ Subsections (a) through (d) of section 955a charge separate offenses which require proof of different facts. Subsection 955a(a) requires proof that the vessel on which the crime occurred was a "vessel of the United States"; the other subsections do not require such proof. A conviction under subsection 955a(b) requires proof that the person manufacturing, distributing, or possessing the controlled substance on board any vessel is a "citizen of the United States," while the other subsections of 955a do not require manufacture, distribution, or possession by an American citizen. Subsection 955a(c) requires proof that the vessel on which any person manufactures, distributes, or possesses a controlled substance is "within the custom waters of the United States"; the other subsections do not require proof that the vessel be within the custom waters. And finally, subsection 955a(d) requires proof that the defendant intended the controlled substance "be unlawfully imported into the United States," yet the other subsections do not require proof of intent to import.

Appellants contend that subsections (a) through (d) do not establish separate elements for each crime but merely establish separate criteria by which jurisdiction of vessels on the high seas may be obtained. In *United States v. Julio-Diaz,* 678 F.2d 1031 (11th Cir.1982), however, this court characterized proof that the ship involved is a vessel of the United States as "a material element" of section 955a(a). *Id.* at 1032–33. Furthermore "[i]f each [offense] requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Iannelli v. United States,* 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975). Because subsections (a) through (d) require

---

**5.** The defendants filed a motion in the district court to dismiss and/or compel election of counts to preclude multiple convictions and/or sentences. The trial court denied these motions without prejudice but indicated that con-

secutive sentences for the convictions would not be imposed. The defendants were ultimately sentenced to five years imprisonment on each of Counts I, II, III, and IV, to be served concurrently.

proof of different facts, we hold that section 955a(a)–(d) meets the *Blockburger* test for determining whether two offenses are sufficiently distinguishable to permit the imposition of multiple convictions. *See Brown v. Ohio,* 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977).

Our conclusion is in accord with a recent decision of the Fourth Circuit in *United States v. Howard-Arias,* 679 F.2d 363 (4th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982). In *Howard-Arias* the defendant argued that the double jeopardy guarantee barred his multiple convictions and multiple punishments under subsections 955a(a) and 955a(d). The court noted the different elements of proof between subsection (a) and subsection (d) and stated that if the *Blockburger* test is applied to the statutes as written, "there can be no doubt ... that the provisions define two distinct offenses." 679 F.2d at 369 n. 7.

As a rule of statutory construction which serves as a means of discerning Congressional intent, the *Blockburger* test should not be controlling where there is a clear indication of contrary legislative intent. *Albernaz,* 450 U.S. at 340, 101 S.Ct. at 1143. Accordingly, we have reviewed the legislative history of 21 U.S.C. § 955a but do not find a clear indication of an intent contrary to the presumption which should be accorded to section 955a(a)–(d) after application of the *Blockburger* test. *See id.* The Senate Report accompanying the passage of section 955a states that the section was enacted "to facilitate enforcement by the Coast Guard of laws relating to importation of illegal drugs and for other purposes." S.Rep. No. 96–855, 96th Cong., 2nd Sess. 1 (1980), *reprinted in part in* 1980 U.S.Code Cong. & Admin.News, 2785. The House Report reveals that the purpose was "to facilitate increased enforcement by the Coast Guard." H.R.Rep. No. 96–323, 96th Cong., 1st Sess. 2 (1980). The House Report goes on to state that section 955a "is designed to prohibit all acts of illicit trafficking in controlled substances on the high seas which the United States can reach under international law." *Id.* at 11. The Senate Report similarly states that section 955a "would give the Justice Department the maximum prosecu-

torial authority permitted under international law." S.Rep. No. 96–855, at 2, 1980 U.S.Code Cong. & Admin.News, at 2785.

While the legislative history suggests a Congressional intent to grant federal law enforcement officials expansive authority over possession, manufacture, and distribution of controlled substances, the legislative history is silent as to Congress' intent regarding separate convictions and punishments for each subsection of 955a(a)–(d). Appellants maintain that this silence indicates an ambiguity over whether Congress intended to allow separate convictions. They argue that because the legislative history is ambiguous, the rule of lenity as expressed in *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), controls. In *Albernaz,* the Court held that it was wrong to read silence in the legislative history as an ambiguity over whether Congress intended to authorize multiple punishment. 450 U.S. at 340–41, 101 S.Ct. at 1143. "[I]f anything is to be assumed from the Congressional silence on this point, it is that Congress was aware of the *Blockburger* rule and legislated with it in mind." *Id.* at 341–42, 101 S.Ct. at 1143–44. The Court went on to hold that the rule of lenity has no application where the statutory provisions are unambiguous on their face and the legislative history "gives us no reason to pause over the manner in which these provisions should be interpreted." *Id.* at 343, 101 S.Ct. at 1144. We conclude from the unambiguous language of section 955a(a)–(d) and the absence of any evidence of a contrary intention in the legislative history that subsections (a) through (d) of 21 U.S.C. § 955a state separate offenses for which separate convictions may be obtained.

■ Appellant Carbonell further argues that multiple punishments for violations of different subsections of 21 U.S.C. 955a violate the double jeopardy clause. As the Court observed in *Albernaz,* "the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed." 450 U.S. at 344, 101 S.Ct. at 1145. Our reading of the statutory language and the legislative

history of section 955a in light of the rule set forth in *Blockburger* convinces us that because Congress intended for each violation of subsection (a) through (d) to be a separate crime, imposition of multiple punishments for separate violations of section 955a(a)–(d) does not violate the constitution. *See id.*

## III *BRADY* VIOLATION

James Henry Wilson, the captain of the OCEAN QUEEN, was a key government witness at the trial of the appellants. Wilson, charged along with the appellants in each of the five counts of the indictment, entered a plea of guilty to Count One and agreed to testify on behalf of the government in consideration of the government's dismissal of the remaining counts and agreement to remain silent at the time of sentencing on Count I. The government was ordered, prior to trial, to produce "all evidence favorable to the defendant on the issue of guilt, or on matters of impeachment." In response, the government provided each appellant with a copy of an FBI "rap sheet" for Wilson and represented that it "understood the 'rap sheet' to contain the full extent of James Henry Wilson's criminal record." After the appellants' convictions, it was determined that the "rap sheet" did not reflect two convictions in Florida state courts: discharging a firearm within the city limits and possession of marijuana in a quantity less than 5 grams. Both of these offenses are misdemeanors under the laws of Florida, carrying a maximum penalty of not more than one year imprisonment. Fla.Stat. §§ 790.15, 893.13. Appellants moved to vacate the judgment asserting that the dictates of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated by the government's failure to disclose two misdemeanor convictions of its key witness. The trial court denied the motions and appellants argue on appeal that the failure to disclose compels reversal of the convictions.

■ In *Brady v. Maryland* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. To establish a *Brady* violation, the defendant must prove three factors: (1) the prosecution's suppression of evidence; (2) the favorable character of the suppressed evidence for the defense; and (3) the materiality of the suppressed evidence. *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706 (1972); *Monroe v. Blackburn,* 607 F.2d 148, 150 (5th Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 816 (1980).

■ Appellants do not allege that the government knowingly withheld the criminal record of Wilson but contend that the government "should have known" of the criminal record of its witness, including any state misdemeanor convictions. "While *Brady* requires the government to tender to the defense all exculpatory evidence in its possession, it establishes no obligation on the government to *seek out* such evidence." *United States v. Walker,* 559 F.2d 365, 373 (5th Cir.1977); *see also United States v. Beaver,* 524 F.2d 963, 966 (5th Cir.1975) ("But *Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess."), *cert. denied,* 425 U.S. 905, 96 S.Ct. 1498, 47 L.Ed.2d 756 (1976); *accord United States v. Atkinson,* 512 F.2d 1235, 1239 (4th Cir.1975) (government prosecutor has no duty to disclose information to the defense as to the criminal background of a prosecution witness where it is not even charged that government attorneys were in possession of the information).

Because there is no allegation that the government attorneys in the instant case had any knowledge of Wilson's misdemeanor convictions for violations of state law and because the government had no obligation to seek out information on Wilson's criminal record not otherwise contained in government records, the government did not suppress any evidence favorable to the appellants. Although we will not condone the withholding of a prosecution witness' criminal record, the disclosure of the witness' FBI "rap sheet" fully complied with *Brady* and the requirements of due process.

*Cf. United States v. Auten,* 632 F.2d 478, 481 (5th Cir.1980) (where government prosecutor, because of time constraints, chose not to run an FBI or National Crime Information check on the criminal record of a government witness, the government was held to have knowledge of the witness' criminal record and, as such, withheld or suppressed the available information).[6]

## IV STOPPING AND BOARDING OF THE OCEAN QUEEN

■ Appellants contend that the Coast Guard's purpose in stopping and boarding the OCEAN QUEEN on the high seas was not to conduct an administrative inspection for safety violations but was rather a pretextual stop for the sole purpose of searching for marijuana in violation of the Fourth Amendment. They rely on *United States v. Piner,* 608 F.2d 358 (9th Cir.1979), which held that the random stopping and boarding of a vessel after dark for safety and registration inspection without cause to suspect noncompliance constitutes a violation of the Fourth Amendment.

This circuit and the former Fifth Circuit have held on numerous occasions that the Coast Guard may, consistent with the Fourth Amendment, exercise plenary authority under 14 U.S.C. § 89(a) to stop and board American vessels on the high seas to conduct safety and documentation inspections even in the complete absence of suspicion of criminal authority. *See e.g. United States v. Kubiak,* 704 F.2d 1545, 1547–48 (11th Cir.1983); *United States v. Clark,* 664 F.2d 1174, 1175 (11th Cir.1981); *United States v. Williams,* 617 F.2d 1063, 1075–76, 1086 (5th Cir.1980) (en banc); *United States v. Warren,* 578 F.2d 1058, 1064–65 (5th Cir. 1978) (en banc), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980); *see also United States v. Marino-Garcia,* 679 F.2d 1373, 1385 (11th Cir.1982) (court specifically rejects the reasoning in *United States v. Piner*), *cert. denied,* —— U.S. ——, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983). The mere fact that the boarding officers may also suspect narcotics violations does not taint the validity of the safety and documentation inspection. *United States v. Alonso,* 673 F.2d 334, 336 (11th Cir.1982); *United States v. Jonas,* 639 F.2d 200, 203 (5th Cir. 1981). It is proper for the Coast Guard to entertain a dual purpose in boarding under section 89(a): to conduct a safety and documentation inspection and to look for obvious customs and narcotics violations. *United States v. Clark,* 664 F.2d at 1175; *United States v. Jonas,* 639 F.2d at 203. Thus, we hold that the stopping and boarding of the OCEAN QUEEN was not in violation of the Fourth Amendment.

## V CONSTITUTIONALITY OF 21 U.S.C. § 955a

Appellants argued in pretrial motions that 21 U.S.C. § 955a: violates the First, Fourth, Fifth and Ninth Amendments; is void for vagueness; exceeds the scope of legislative power vested in Congress under Article I of the Constitution; violates certain fundamental principles of international law, the law of nations, and international agreements and treaties; fails to confer jurisdiction on the trial court; and fails to inform appellants of the exact nature of the offenses alleged to have been committed so as to appraise them of the elements of those offenses. The trial court denied the appellants' motions. Appellants acknowledge this court's recent decisions upholding section 955a but reassert their claims on appeal in order to fully preserve them for later appeal.

In light of the decisions of the Eleventh Circuit upholding the constitutionality of 21 U.S.C. § 955a, we find no merit in any of appellants' contentions. *See United States v. Marino-Garcia,* 679 F.2d 1373, 1383 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983); *United States v. Julio-Diaz,* 678 F.2d 1031, 1033–34 (11th Cir.1982); *United States v. Liles,* 670 F.2d 989, 991–92 (11th Cir.); *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982); *United States v. Riker,* 670 F.2d 987, 988 (11th Cir.1982).

---

**6.** Because we find that the appellants have not shown that the government suppressed evidence, we do not address the government's additional argument that the misdemeanor convictions could not have been used under Fed.R. Evid. 609(a) and, therefore, the evidence was also neither "favorable" nor "material" to the defense.

The convictions of all appellants on all counts are

AFFIRMED.