**UNITED STATES of America, Appellee,**

v.

**Kenneth CHRISTENSEN, Defendant,
Appellant.**

**No. 83–1496.**

United States Court of Appeals,
First Circuit.

Argued March 7, 1984.

Decided April 12, 1984.

Alfred P. Kremer, Rochester, N.Y., and Gerardo Ortiz Del Rivero, Federal Public Defender, and David W. Roman, Asst. Federal Public Defender, San Juan, P.R., on brief for defendant, appellant.

Charles E. Fitzwilliam, Asst. U.S. Atty., San Juan, P.R., with whom Daniel F. Lopez Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before CAMPBELL, Chief Judge, COFFIN and BREYER, Circuit Judges.

COFFIN, Circuit Judge.

Appellant appeals from two judgments of conviction for possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 955a(a) (Count One) and § 955a(b) (Count Two). A sentence of five years was imposed for each count, to run consecutively, and a fine of $5,000 was also imposed for each violation. A special pa-

role term of two years was imposed for each violation; these terms, however, were to be concurrent. Appellant's most substantial issue on appeal is whether this multiple conviction, or at least multiple sentencing, violates the Double Jeopardy clause. Other alleged errors relate to denial of appellant's Sixth Amendment right to effective assistance of counsel and comments by the prosecutor.

## I. Background

Appellant, a United States citizen and master of a Great Lakes tug, Alida, took his vessel to Florida in search of work, and, changing most of the crew, went on to Grand Cayman Island, and thence to a point off the Colombian coast, where some 55,500 pounds of marijuana, valued at $11 million, were loaded from lighters. Subsequently, the Coast Guard seized the vessel in the vicinity of the Virgin Islands and Puerto Rico. Appellant's explanation for his involvement after the tug reached Florida was that he was at first under the impression that his charterers were government agents and that he was on a secret and highly lucrative government mission. Only after leaving Grand Cayman Island did he realize that he was in the hands of drug smugglers; from then on he was acting under duress and with fear for himself and his family.

Appellant was arrested on December 6, 1982, indicted on December 8, and, after several changes of appointed counsel, finally conducted his own trial on May 9, 10,

and 11, 1983, with a private court-appointed counsel and a lawyer from the Public Defender's office assisting as standby counsel.[1]

## II. Double Jeopardy

■ Appellant's major contention is that the four subsections of 21 U.S.C. § 955a—(a), (b), (c), and (d)[2]—outline only one offense, the smuggling of controlled substances, and were enacted to close loopholes that enforcement authorities had encountered after the inadvertent repeal, in 1970, of 21 U.S.C. § 184a, the law proscribing the use of narcotics on United States vessels on the high seas.

Consequently, appellant argues, each section was designed to close a loophole. Subsection (a) invoked jurisdiction over United States vessels, and forbade possession with intent to distribute by any person thereon. Subsection (b) invoked jurisdiction over United States citizens and proscribed their possession with intent to distribute on any vessel. Subsection (c) rested on territorial jurisdiction and barred any person on any vessel within customs waters from such possession. And subsection (d) relied on the historic power to bar possession with the knowledge or intent that the substances would be unlawfully imported. Each, says appellant, is merely a hook for catching a fish; there was no legislative intent to use more than one hook on a fish.

We have considerable sympathy for this argument, particularly as it might be limit-

---

1. On April 6, 1983, the court had denied a motion to dismiss Count Two of the indictment on double jeopardy grounds, in a three-page order relying on the separate requirements of § 955a(a), proof of vessel registration, and § 955a(b), proof of defendant's citizenship.

2. These sections read as follows:

"(a) It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

"(b) It is unlawful for a citizen of the United States on board any vessel to knowingly or

intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

"(c) It is unlawful for any person on board any vessel within the customs waters of the United States to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

"(d) It is unlawful for any person to possess, manufacture, or distribute a controlled substance—

"(1) intending that it be unlawfully imported into the United States; or

"(2) knowing that it will be unlawfully imported into the United States."

ed to § 955a(a) and (b). That is, we find it severe that, by the mere act of a United States citizen joining a smugglers' vessel with United States registry, he immediately commits two crimes. He does not have the same subsequent "choice" that lay before one, who had broken into a house, to decide whether or not to rob the occupant, a choice which the District of Columbia Circuit once held significant in that "the course of conduct admitted of interruption and alteration in response to the deterrent influence of additional punishment". *Irby v. United States*, 390 F.2d 432, 434–35 n. 4 (D.C.Cir.1967) (en banc). The court accordingly held that it could not say that Congress did not contemplate additional disincentive for robbery in addition to housebreaking.

This reasoning, however, does not carry us very far in this case. In the first place, one could say that just as the housebreaker had the option to refrain from robbing an occupant, so does the United States citizen have the option to refrain from joining the crew of a United States vessel. In the second place, the argument tends to carry us further than we would wish to go. Appellant here does not distinguish the crimes described in § 955a(a) and (b) from those in (c) and (d). But the latter subsections describe discrete dangers—drug traffic in customs waters (c) and unlawful importation (d)—which might very well be viewed by Congress as separate crimes warranting separate punishment.

Once, however, sections (c) and (d) are recognized as stating separate crimes, it becomes exceedingly difficult for a court to find a rationale for distinguishing them from (a) and (b). True, (c) and (d) cover different vessel locations and, in (d), the added ingredient of knowledge or intent as to unlawful importation, while (a) and (b) turn on the registry of a vessel or the citizenship of a defendant. But, if one can simultaneously violate both (c) and (d) by being on a vessel in the requisite location and with the requisite knowledge or intent, we see no convincing logical basis for saying a United States citizen does not similarly violate both (a) and (b) by boarding a United States vessel.[3]

In short, while it is possible to say, were this a fresh question, that Congress was addressing only one crime, smuggling, it is also possible and, in the light of the history of both legislative and judicial dealings with the illicit narcotics trade, more likely that Congress had in mind the equal but separate objectives of stopping the uses of United States vessels in smuggling enterprises, discouraging United States citizens from engaging in such enterprises, protecting waters adjacent to the coast, and stopping participation in plans to import. We are not able meaningfully to distinguish the case before us from *Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), where a single sale of narcotics was held to violate three separate crimes: sale not "in pursuance of a written order", sale "not in the original stamped package or from the original stamped package", and sale with knowledge of unlawful importation. The Court said: "The fact that an offender violates by a single transaction several regulatory controls devised by Congress as means for dealing with a social evil as deleterious as it is difficult to combat does not make the several different regulatory controls single and identic". *Id.* 357 U.S. at 389, 78 S.Ct. at 1283.

Moreover, other recent decisions of courts of appeals have scrutinized the legislative history of 21 U.S.C. § 955a and have largely covered the field. In *United States v. Howard-Arias*, 679 F.2d 363 (4th Cir. 1982), the Fourth Circuit upheld multiple convictions and consecutive sentencing under both § 955a(a) and (d). And in *United*

---

**3.** This seems very similar to our holding in *United States v. Tashjian*, 660 F.2d 829, 844 (1st Cir.1981), that two statutes supporting a count charging mail fraud and a count charging the use of a fictitious name in furthering a mail fraud described separate offenses. We have no difficulty in distinguishing *United States v. Montilla Ambrosiani*, 610 F.2d 65 (1st Cir.1979) in which we chided the government for trying to convict a defendant, on the same set of facts, for (a) concealing and (b) failing to disclose.

*States v. Luis-Gonzalez,* 719 F.2d 1539, 1547 (11th Cir.1983), the court dealt with an indictment of four counts, each count based on a different subsection of 21 U.S.C. § 955a, and held:

> "We conclude from the unambiguous language of section 955a(a)–(d) and the absence of any evidence of a contrary intention in the legislative history that subsections (a) through (d) of 21 U.S.C. § 955a state separate offenses for which separate convictions may be obtained."[4]

We would not lightly disregard such holdings or, without strong countervailing reasoning or authority, create a conflict among the circuits.

Finally, whatever latitude we may have had in applying the "rule of lenity" in interpreting other laws, *see O'Clair v. United States,* 470 F.2d 1199 (1st Cir.1972) (Bank Robbery Act), and whatever justification there might once have been in seeing a weakening of "the same evidence" test of *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), *see Irby,* 390 F.2d at 436–37 n. 6 (Leventhal, J., concurring), we are constrained to say that *Blockburger* is still alive and well. The Supreme Court in *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), applied the *Blockburger* test to determine whether Congress provided for cumulative punishments. And in *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), the Court upheld consecutive sentencing for conspiracy to import and conspiracy to distribute marijuana, noting that they were

separate statutory offenses, that different ends were at stake, that each required proof of a fact that the other did not.[5]

Significantly, we think, the Court stated that the " 'touchstone' of the rule of lenity 'is statutory ambiguity.' ", *id.* at 342, 101 S.Ct. at 1144, and that when legislative history is silent on whether consecutive sentences can be imposed, a court should assume "that Congress was aware of the *Blockburger* rule and legislated with it in mind." *Id.* The Court added that "the history of the narcotics legislation in this country 'reveals the determination of Congress to turn the screw of the criminal machinery—detection, prosecution and punishment—tighter and tighter.' *Gore v. United States,* 357 U.S., at 390 [78 S.Ct., at 1283]." *Id.* at 343, 101 S.Ct. at 1144.

In sum, we are dealing with facially separate offenses set forth in distinct sections of a statute. We note that each of the four offenses requires proof of a fact not required by any other. We have reviewed the legislative reports accompanying this legislation. We see a deep-seated motive to fill loopholes defeating prior efforts to prevent smuggling. We see no indications one way or the other as to the pyramiding of penalties. We therefore feel constrained to say that 21 U.S.C. § 955a(a)–(d) state separate offenses, because each section requires some factual proof not required by another, and that, there being only a neutral record, there is no positive indication that the Congress did not desire cumulative sentencing. *United States v. Marrale,* 695 F.2d 658, 662 (2d Cir.1982).[6]

---

**4.** No question survived on appeal in *Luis-Gonzalez* as to the propriety of consecutive sentencing, since the trial court imposed concurrent sentences. *Id.* at 1546 n. 5.

**5.** We must conclude that our holding in *United States v. Honneus,* 508 F.2d 566, 569–70 (1st Cir.1974), that, where an agreement embraced three separate objects—importation, distribution, and smuggling—the conspiracy was but a single crime, is no longer good law.

**6.** The *Marrale* court, after applying its three-step test (discrete statutory sections, each offense requiring a unique ingredient, absence of showing of intent to bar cumulative punishments), added a consideration that "buttressed" its con-

clusion, namely, that different goals were addressed by the two statutes involved—conspiracy to import marijuana and conspiracy to distribute it. 695 F.2d at 663–65. In the case at bar we deem it sufficient to declare that the three-step test is satisfied. Even if 21 U.S.C. § 955a(a)–(d) were said to address the same goal, e.g., smuggling, we would not feel that this would compel any different result. In fact, however, we see several discrete goals served—preventing use of U.S. vessels, discouraging U.S. citizens, protecting customs waters, and discouraging plans to import drugs into the United States.

### III. Right to Counsel

■ Appellant gathers together a number of complaints relating to counsel. Having had a total of four counsel, he claims, principally, that when he was forced to go to trial, the court did not make sufficient inquiry of counsel to determine if counsel were prepared, and of appellant to determine if he fully appreciated the difficulties in defending himself. There was also a suggestion that one of appellant's court-appointed lawyers had a conflict of loyalties.[7]

The history of appellant and his lawyers is a carousel. Appellant was indicted on December 8, 1982; his first lawyer was appointed on December 14, filed a number of motions (including that which raised the double jeopardy issue we have discussed), and withdrew on January 21, 1983. A second lawyer was appointed on February 1, and a third on February 8. Although the former had little to do with appellant, the latter conferred with appellant, according to appellant's own count, on no fewer than eight occasions.

Finally, three months later, on May 6, 1983, a few days before trial, appellant moved for new counsel, stating that his counsel had only wanted appellant to plead guilty and had taken no steps to prepare for trial. The court, after hearing, and after repeating the truism, as did the judge in *United States v. Hafen*, 726 F.2d 21 at 26 (1st Cir.1984), that one who acts as his own lawyer has a fool for a client, and observing that the latest motion for continuance was merely another ruse for delay, ordered that the case go on as scheduled, with appellant representing himself but having the standby assistance of the last appointed counsel as well as an attorney from the Public Defender's office. Appellant responded that while he had no evidence or witnesses, he was personally prepared.

We do not lightly second guess trial judges facing intransigent and sometimes irrational litigants. In this case appellant had dealings with three lawyers in five months, to no effect. We do not need to credit either appellant's claim that his lawyers merely wanted him to plead guilty or his lawyers' claims that they were dutifully preparing for trial. What has occupied our attention is appellant's catalogue of things that he had wanted his lawyers to do. If there appeared to be some obviously significant pre-trial preparation that had been ignored, we might look more closely. But we see nothing that remotely resembles an effective defense—past towing contracts and photographs, fuel receipts, receipt for a new pump, a fumigation report, a plethora of charts, surveys to show size of fuel tank, weather reports, the presence of his original crew (before the onset of any illegal activity), the presence of attorneys who at best would be hostile witnesses. Appellant was unable to supply addresses of three persons who had allegedly coerced him to take the last voyage.

Enough time had gone by, enough attorneys had been provided and had withdrawn, enough continuances granted, enough documents made available, and enough admonition given to satisfy *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *United States v. Hafen*, 726 F.2d 21 (1st Cir.1984); and *Maynard v. Meachum*, 545 F.2d 273 (1st Cir.1976).

The other errors complained of deserve little comment. The prosecutor's criticized comments fell far short of any errors that, not having been objected to, could be said to be "plain". The supposed errors of the court were of little moment. The instructions as a whole made quite clear the proper standard of reasonable doubt.

*Affirmed.*

---

7. This latter allegation falls at the outset. Counsel from the Public Defender was appointed to stand by at appellant's trial. A different attorney from the same office had represented another person who had pleaded guilty and had been sentenced. Appellant was twice told of these circumstances and asked if he objected to the assistance of this attorney—and twice accepted the offer of help.