794 F.2d 1503
 UNITED STATES of America, Plaintiff-Appellee,
v.
Julio VIDAL-HUNGRIA, Jader Meza-Castillo, Jose Castro-Lahoz,
Alberto Robinson-Vasquez, Alfonso Galvis-Diaz,
Angel Ferreira-Navas, Enrique
Aaron-Pinto, Jacinto
Alava-Solano,
Defendants-
Appellants.
 No. 85-5079.
 United States Court of Appeals,
Eleventh Circuit.
 July 25, 1986.
 
 Frederick E. Graves, Fort Lauderade, Fla., for Julio Vidal-Hungria, Jose Castro-Lahoz and Alberto Robinson-Vasquez.
 Miguel Caridad, Asst. Federal Public Defender, Miami, Fla., for Jader Meza-Castillo, Alfonso Galvis-Diaz, Angel Ferreira-Navas and Enrique Aaron-Pinto.
 Leon Kellner, U.S. Atty., Kenneth Noto, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Southern District of Florida.
 Before FAY and KRAVITCH, Circuit Judges, and HENLEY*, Senior Circuit Judge.
 CORRECTED OPINION
 KRAVITCH, Circuit Judge:
 
 
 1
 The eight appellants in this case were convicted on both counts of a two-count indictment charging them with (Count I) violating 21 U.S.C. Sec. 955c by conspiring with each other and with persons unknown to possess with intent to distribute marijuana while aboard a vessel subject to the jurisdiction of the United States in violation of 21 U.S.C. Sec. 955a(a), and (Count II) violating 21 U.S.C. Sec. 955a(a) and 18 U.S.C. Sec. 2 by possessing with intent to distribute marijuana while aboard a vessel subject to the jurisdiction of the United States on the high seas. The appellants all were named in the same indictment and convicted by the same jury following a joint trial. On appeal, the vessel's captain, Jacinto Alava-Solano, contends that his trial and conviction violated the constitutional prohibition against double jeopardy. The seven crew members assert that their convictions are invalid because the evidence at trial was insufficient as a matter of law to support their convictions on either count.[1] For the reasons set forth below, we reject Alava-Solano's double jeopardy argument and affirm his convictions on both counts. As to the crew members' claims, however, we agree with their contention that the record evidence is insufficient to support their convictions.
 
 I. FACTUAL BACKGROUND AND PRIOR PROCEEDINGS
 
 2
 In considering the sufficiency of the evidence, we have sifted through the record to ensure consideration of the evidence in its entirety. Our reading of the complete transcript indicates that the following facts were established at trial.
 
 The Security Search
 
 3
 At approximately noon on June 3, 1984, a United States Coast Guard cutter on routine patrol sighted the motor vessel MRS. WHITE, a 156-foot coastal freighter flying the British flag, approximately seven miles off the coast of the Bahamas in international waters. The markings on her stern included her name and indicated a home port of Tortola, BVI, signifying the British Virgin Islands. The Coast Guard received permission to board via radio from Alava-Solano, who identified himself as the captain. The six-member Coast Guard boarding party included Petty Officer First Class David Amidon, Petty Officer First Class Charles Hefner, Spanish-English interpreter Seaman Herman Plaza, Chief Warrant Officer Robert Webber, Chief Warrant Officer Jeffrey Fulcher, and Coast Guardsman Bartlett.
 
 
 4
 Upon boarding the vessel, Amidon, who was the chief boarding officer, spoke with Alava-Solano through interpreter Plaza. Amidon obtained permission for the Coast Guard search team to check all "man-sized" compartments to make sure no other persons were on board. At Alava-Solano's command, six of the MRS. WHITE crew members, Julio Vidal-Hungria, Jose Castro-Lahoz, Alberto Robinson-Vasquez, Jader Meza-Castillo, Angel Ferreira-Navas, and Enrique Aaron-Pinto, were mustered on the bow of the ship. Hefner was stationed there to watch them throughout the search procedure. The Chief Engineer of the MRS. WHITE, Alfonso Galvis-Diaz, remained in the engine room, with the Coast Guard's permission, in order to perform necessary upkeep maintenance on the engine. Alava-Solano, accompanied by interpreter Plaza, remained apart from the crew members in the aft section of the boat throughout the search. Amidon was on the bridge with Alava-Solano for a total of approximately four hours. He and Plaza examined all the ship's papers during the first half hour. The papers appeared to be in order and indicated that the port of origin was Baranquilla, Colombia. They were told that the last port of call had been Grand Caicos in the Bahamas, and the destination point was Freeport, Bahamas. The documents from the Baranquilla port described a large lumber and cement cargo. The other Coast Guard members proceeded to make an extensive search of all areas, the main purpose of which was two-fold--the interdiction of Haitian refugees and interdiction of contraband. The search revealed a large cargo of cement and lumber in the cargo hold, properly stowed for passage. The vessel was in working condition for operation as a cargo ship.
 
 
 5
 Discovery of the Sealed Forward Compartment
 
 
 6
 More than two hours after the search had begun, Hefner notified Amidon and sweep team leader Webber that from his station up in the bow he detected the odor of marijuana. Webber joined him on the bow to try to assist in locating the source of the odor. Webber, however, did not detect the odor. Eventually Hefner, who is six feet two inches tall, identified a six-foot vent, next to which he had been standing for the past two hours, as the possible source. The top of the vent was covered by a greyish-silver plastic bag tied around the bottom with twine. Amidon joined the group up on the bow at this point. He did not detect an odor either. Webber removed the twine and bag, revealing a burlap sack. Webber testified that at this point he first smelled marijuana. Webber then removed the burlap sack, revealing a makeshift metal cover which had grease all over it. Webber removed the greased metal cover, revealing a jagged border at the top of the metal vent. Amidon testified that he first smelled marijuana when he stuck his head over the top of the uncovered vent.
 
 
 7
 Fulcher then came up to assist and attached his large flashlight to the end of a twenty-foot rope which they obtained from the Coast Guard vessel and lowered it down the vent. They saw bales of what they believed to be marijuana at the bottom. They relayed their discovery of marijuana to Plaza, who was still with Alava-Solano in the aft section, through the predetermined coded message that their "big or B-light was broken." Amidon obtained permission from Alava-Solano for them to try to gain access to the unaccounted for compartment in the bow. Their efforts led Amidon and Webber down into a locker where paint supplies were stored. They found numerous paint cans and noted a thick tacky layer of paint on one area of the floor. After moving the paint cans, and scraping away the paint, Webber found a three-foot square steel plate that appeared to have been tack-welded to the floor. They also noticed that a pad-eye and a hand hook had been welded near that area. They pried off the plate and removed a white compound substance in the cracks around the edge. They found an aluminum sheet wired up underneath the opening apparently intended to catch the drippings from the tack-welding. Finally, after removing the aluminum sheeting, they uncovered an entrance to a compartment in which bales of what appeared to be marijuana wrapped in burlap were stacked. The compartment was attached to the vent uncovered above. After getting Alava-Solano's permission, they performed a field test on the bales which tested positive for THC, the active ingredient in marijuana. Sometime after this, Alava-Solana asked Plaza if they had found marijuana.
 
 Discovery of the Sealed Aft Compartment
 
 8
 Meanwhile, approximately one to two hours after boarding, Fulcher, who had been examining the main cargo hold suggested looking at the blueprints of the vessel. He thought that the forward and aft bulkheads in the main hold might be of newer material than the area around them. Amidon asked Alava-Solano for the blueprints and then handed them over to Fulcher who knew how to read them. Fulcher examined them to determine if there was unaccounted for space. He perceived that there was an unaccounted for compartment in front of the forward bulkhead of the cargo hold and another behind the aft bulkhead just below the main deck in front of the pilot house. There was no visible sign of access to it. Fulcher examined the sounding tubes--pipes which extend from the various compartments below deck of a ship up to the deck so that the contents of the compartments can be checked. There was no odor emanating from the tubes as they were. After receiving permission from Alava-Solano, Fulcher sounded the sounding tubes. The sounding of the first few tubes revealed nothing unusual--some compartments contained liquid, some were empty. After sounding the fourth or fifth tube, however, finding it full of oil, Fulcher leaned over to smell the tube and detected an odor of marijuana. Fulcher reported the results of his investigation back to Amidon.
 
 
 9
 After the uncovering of the forward compartment, Amidon obtained permission from Alava-Solano to drill a hole into the aft deck of the ship. Using equipment from the Coast Guard vessel, the boarding party drilled a hole into the main deck above the area behind the aft bulkhead of the main cargo hold. They then smelled marijuana, inserted a small piece of pipe and, from a point a few feet below the deck, retrieved a leafy substance which was then field tested positive for marijuana.
 
 The Arrests and Confiscation of Evidence
 
 10
 Upon discovering the two hidden compartments and their contents, the boarding team relayed the information to Coast Guard authorities and received orders to arrest all eight individuals on the MRS. WHITE. The eight were arrested and transferred to the Coast Guard cutter. The Coast Guard party remained on the MRS. WHITE for the following twenty-four hour period and navigated her to Miami, Florida. Upon their arrival in Miami, the eight men under arrest and the vessel were turned over to the custody of Agent Azcuy of the United States Customs Service. Special agents from the Drug Enforcement Agency (DEA) removed the contents of the hidden compartments, tested random samples of several bales and identified it as marijuana. The DEA weighed it and found it totalled approximately 23 tons, and then destroyed it according to DEA procedures. The DEA agents searched the vessel for marijuana residue but did not discover any. Two pairs of shoes and a bedsheet removed from the crew's quarters were tested for microscopic amounts of marijuana residue but none was found.
 
 The Initial Indictment and Trial
 
 11
 On June 13, 1984, the eight appellants were indicted in case number 84-371-Cr-JE. They were each charged with (Count I) violating 21 U.S.C. Sec. 955c by conspiring with each other and with persons unknown to possess with intent to distribute marijuana while aboard a vessel within the customs waters of the United States in violation of 21 U.S.C. Sec. 955a(c), and (Count II) violating 21 U.S.C. Sec. 955a(c) and 18 U.S.C. Sec. 2 by possessing with intent to distribute marijuana while aboard a vessel within the customs waters of the United States. Alava-Solano pleaded not guilty and the government brought him to trial on August 15, 1984.
 
 
 12
 In both the indictment and at trial, the government, relying on the British flag flown by the MRS. WHITE, the home port painted on her stern and the Terminable Certificate of Registration included in her papers, proceeded on the theory that the MRS. WHITE was a British vessel at the time of the June 3 boarding and that it was within the customs waters of the United States pursuant to a special arrangement with the United Kingdom.[2] At the close of the government's case on August 17, Alava-Solano's attorney filed a motion for a directed verdict under Fed.R.Civ.P. 29 which was denied. She then filed in open court a motion under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requesting that the prosecution release to the defendant information that the Coast Guard had received from the government of the British Virgin Islands indicating that the MRS. WHITE was not a British vessel on the date of the boarding. The United States Attorney denied having received such information. The trial judge granted a recess and the government investigated the allegations. When the court reconvened four days later, the U.S. Attorney reported back to the court that the Coast Guard had received the information from the British Virgin Islands authorities, but the U.S. Attorney had not known of it until after the in-court Brady motion. The government conceded that the MRS. WHITE was not a British vessel at the time of the June 3 boarding.[3] After the judge dismissed the jury, Alava-Solano introduced into evidence a certified copy of the letter from the British Virgin Islands to the Coast Guard, and renewed his request for a judgment of acquittal under Fed.R.Civ.P. 29. The government challenged the appropriateness of the motion and contended that the case should be dismissed for lack of jurisdiction. Without ruling on the Rule 29 motion or issuing any jurisdictional ruling, the trial court entered a written order terminating Alava-Solano's case based on the record of the proceedings and ordering his immediate release.
 
 
 13
 On the same day that Alava-Solano's case was terminated, the government obtained from the grand jury a new indictment in case number 84-0558-CR-Atkins. It listed all eight appellants and was identical in content to the first indictment except that rather than charging them with being on a vessel within the United States customs waters as provided in section 955a(c), the second count containing the substantive count charged them with being on a vessel subject to the jurisdiction of the United States on the high seas as provided in section 955a(a). The first count relating to the conspiracy charge was also altered to allege a conspiracy to violate section 955a(a) rather than section 955a(c). All eight appellants were brought to trial on this indictment on December 5, 1984.
 
 II. ALAVA-SOLANO'S APPEAL
 Double Jeopardy
 
 14
 Alava-Solano challenges his conviction[4] primarily on the grounds that the second trial constituted double jeopardy in violation of the fifth amendment.[5] The Supreme Court has explained that the double jeopardy clause "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). Alava-Solano's argument is grounded in the protections against a second prosecution for the same offense.[6]
 
 
 15
 Alava-Solano's argument is two-fold. First, he asserts that both the substantive count and the conspiracy count in the second indictment must fall under the "same offense test" of Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). This argument turns on his contention that violation of section 955a(c), as charged in the first indictment, is a lesser included offense of violation of section 955a(a), as charged in the second indictment, on the facts in the instant case. Second, he argues that even if the substantive count is not barred, the conspiracy count is invalid under the authority of United States v. Stricklin, 591 F.2d 1112, 1122 (5th Cir.), cert. denied, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979), because there was only one conspiracy alleged. He contends that the invalidity of the conspiracy count in turn undermines the sufficiency of proof for the substantive count because collateral estoppel would bar the government from presenting evidence to the jury in the second trial that had been admitted to support the conspiracy count in the first trial.
 
 
 16
 The government argues that the district court was correct in denying the double jeopardy claim on the authority of United States v. Luis-Gonzalez, 719 F.2d 1539, 1546 (11th Cir.1983) (en banc). We agree that Luis-Gonzalez controls this claim as to the substantive count. In that case, we analyzed section 955a[7] under the test enunciated in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). We held that "subsections (a) through (d) of 21 U.S.C. Sec. 955a state separate offenses for which separate convictions may be obtained." 719 F.2d at 1547. We relied on the plain language of the statute as well as a review of the legislative history pursuant to the directive of Whalen v. United States, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), and found no Congressional intent contrary to our holding. See also United States v. Christensen, 732 F.2d 20, 22-23 (1st Cir.1984) (adopting Luis-Gonzalez ); United States v. Howard-Arias, 679 F.2d 363 (4th Cir.), cert. denied, 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982) (section 955a(a) and section 955a(c) are separate offenses for purposes of double jeopardy analysis).
 
 
 17
 As to the two subsections at issue in the case at bar, section 955a(a) requires proof that the vessel on which the crime occurred was a "vessel subject to the jurisdiction of the United States on the high seas." Under the list of definitions for terms used in sections 955a to 955d, section 955b(d) states that this classification "includes a vessel without nationality or a vessel assimilated to a vessel without nationality, in accordance with paragraph (2) of article 6 of the Convention on the High Seas, 1958." Section 955a(c), however, requires proof that the vessel be "within the customs waters of the United States." As set forth in footnote 2 above, this classification includes a foreign vessel subject to some type of agreement with the United States, or other vessels that are within four leagues of the United States coast. The elements of the offenses charged in the two indictments therefore were not the same. Furthermore, as we indicated in Luis-Gonzalez, there is no clear indication of contrary legislative intent to our holding that separate convictions for each subsection do not violate the Constitution. 719 F.2d at 1547.
 
 
 18
 Rejection of Alava-Solano's double jeopardy claim as to the substantive count of the indictment necessarily results in rejection of his double jeopardy claim as to the conspiracy count in this case. In United States v. Ruggiero, 754 F.2d 927 (11th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 2661, 86 L.Ed.2d 277 (1985), we held that the substantive and conspiracy RICO violations charged in a second indictment were distinct from the substantive and conspiracy RICO violations for which the defendants previously had been prosecuted based on our finding that the defendants were engaged in two different RICO crimes. We viewed the second prosecution on both the conspiracy and substantive counts as permissible notwithstanding the fact that the conspiracy count in both of the indictments alleged violation of 18 U.S.C. Sec. 1962(d). That statute, like section 955c at issue in this case, is a prohibition against conspiring to violate the other provisions in the relevant code section. The elements necessary to prove a violation of such a statute include in each instance proof of an agreement to violate the specific substantive provision. If the elements of proof for the substantive offenses differ, the elements of proof of the existence of an agreement, the objective of which is to commit the different substantive offenses, necessarily differ. Hence, in the case at bar, proof of the conspiracy count in the first indictment required proof of conspiracy to violate the prohibition in section 955a(c) against possessing with intent to distribute marijuana while aboard a vessel in the customs waters of the United States, whereas proof of the conspiracy count in the second indictment required proof of conspiracy to violate the prohibition in section 955a(a) against possessing with intent to distribute marijuana while aboard a vessel subject to the jurisdiction of the United States on the high seas.
 
 
 19
 Resorting to the Blockburger test, we conclude that the language of section 955c[8] supports a finding that separate convictions are authorized for conspiracies to commit different offenses in sections 955a to 955d. Our holding that Congress foresaw and intended that separate convictions could rest on separate conspiracies to commit each offense is supported by the fact that Congress provided different sentences for those convicted of conspiracies based on different substantive offenses. Section 955c specifies that one who conspires to commit one of the proscribed offenses can be punished to the maximum prescribed for the substantive offense which was the object of the conspiracy. We do not find any indication in the legislative history that Congress intended that agreeing to participate in conspiracies to commit more than one of the proscribed offenses should constitute merely one crime. See Luis-Gonzalez, 719 F.2d at 1546. Hence, double jeopardy does not bar Alava-Solano's conviction on either count of the second indictment.
 
 Collateral Estoppel
 
 20
 The holding above does not dispose of all of the ramifications of Alava-Solano's double jeopardy claims. In addition to his challenge to the successive prosecutions, he raises the issue of collateral estoppel. While we necessarily reject Alava-Solano's argument as presented because it assumes that prosecution under the conspiracy count is barred by double jeopardy, we have considered the applicability to this case of the collateral estoppel principles set down in Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). For the following reasons we conclude that the principles of collateral estoppel embodied in the double jeopardy clause do not bar Alava-Solano's prosecution under the second indictment.
 
 
 21
 In Brown v. Ohio, 432 U.S. 161, 166 n. 6, 97 S.Ct. 2221, 2226 n. 6, 53 L.Ed.2d 187 (1977), the Supreme Court explained that "the Blockburger test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense. Even if two offenses are sufficiently different to permit the imposition of consecutive sentences, successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved by the first." Because the case at bar is one involving successive prosecutions we must determine if the prosecution of Alava-Solano under the second indictment requires the relitigation of factual issues already resolved by the first. In order to properly answer this question in a case such as this where the acquittal is a general order, we must examine the record to determine whether the acquittal could have been based on " 'an issue other than that which the defendant seeks to foreclose from consideration.' " Ashe v. Swenson, 397 U.S. at 442, 444, 90 S.Ct. at 1193, 1194 (footnote omitted). The government points out that the trial court could have concluded that the acquittal on the first indictment was mandated because there was conflicting evidence concerning the status of the MRS. WHITE or because there was insufficient evidence of a violation of section 955a(c) which required the MRS. WHITE to be in the customs waters of the United States. We agree that the record is devoid of any indication that the termination or acquittal in the first case necessarily resolved in favor of Alava-Solano any issue of ultimate fact raised by the second indictment. The government was not, therefore, collaterally estopped from presenting any of the evidence at the second trial. United States v. Ruggiero, 754 F.2d at 935; United States v. Mulherin, 710 F.2d 731, 740-43 (11th Cir.), cert. denied, 464 U.S. 964, 104 S.Ct. 402, 78 L.Ed.2d 343 (1983).
 
 Conspiring with Persons of Names Unknown
 
 22
 In affirming Alava-Solano's convictions on both the conspiracy and substantive counts, we also have considered the impact of our reversal of the conspiracy convictions of the other named coconspirators on his conspiracy conviction. The indictment alleged not only that the appellants had conspired with each other, but also with persons unknown. On more than one occasion, this court has been presented with a similar situation.
 
 
 23
 In United States v. Espinosa-Cerpa, 630 F.2d 328, 330-31 n. 2 (5th Cir.1980), we limited our analysis by examining the case "as if the named alleged conspirators were the only ones with whom appellant might have conspired." Although we acknowledged that the government had correctly stated the law to the effect that a person can be convicted of conspiring with persons whose names are unknown, we held that because there was "absolutely no direct evidence at trial of the participation of anyone other than those on board" we would not adopt the argument by the government that actual participation of the unknown coconspirators "may be inferred from the fact that other individuals must have been implicated to accomplish the financing, unloading and planned distribution of the 35,000 pounds of marijuana on board" the vessel. We pointed to the case of United States v. Pena, 527 F.2d 1356, 1365 (5th Cir.) cert. denied, 426 U.S. 949, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976), wherein the court rejected the inference of a conspiracy with an unidentified supplier of narcotics.
 
 
 24
 More recent precedent, binding in this circuit, indicates, however, that such an inference is appropriate at least in cases where the single named coconspirator is an individual who is captain of a vessel carrying a significant cargo of marijuana. In United States v. Willis, 639 F.2d 1335, 1339 (5th Cir.1981),[9] we reversed the convictions of the crew members for insufficiency of evidence but nevertheless upheld the conspiracy conviction of the vessel captain as supported by the evidence because he "could not have loaded, unloaded, and sold seventeen tons of marijuana without some assistance." Similarly, in United States v. Mosquera, 779 F.2d 628 (11th Cir.1986), we affirmed the conspiracy conviction of the vessel captain even though the jury had acquitted the crew members. We stated that "the jury could reach a common sense conclusion that a drug smuggler would necessarily have contracted with a buyer or distributor in the United States." We conclude that the evidence in the instant case does give rise to the inference that Captain Alava-Solano could not have loaded, unloaded, and distributed his marijuana cargo without some assistance. His conviction for conspiring with persons unknown to commit such offense therefore stands.
 
 
 25
 III. THE CREW MEMBERS' CLAIM OF INSUFFICIENT EVIDENCE
 
 
 26
 The seven crew members' claims that the evidence at trial was not sufficient to support their convictions on either count[10] must be reviewed under this circuit's test articulated in United States v. Bell, 678 F.2d 547, 549 (5th Cir.1982) (en banc). We must determine whether a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. The evidence need not, however, exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. We recently clarified the applicability of the standard to "cases where the primary evidence supporting a defendant's conviction is his presence aboard a vessel containing large quantities of marijuana." In United States v. Cruz-Valdez, 773 F.2d 1541 (11th Cir.1985) (en banc), cert. denied sub nom., Ariza-Fuentas v. United States, --- U.S. ----, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986), we emphasized that the rule is one of reason and that we must consider the totality of the circumstances in each case to determine whether sufficient factors exist from which "a reasonable jury could infer and find beyond a reasonable doubt knowing and intentional participation." 773 F.2d at 1545. We must view the evidence in the light most favorable to the government with all reasonable inferences drawn in favor of the jury's verdict. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Our examination of the entire record in this case did not yield evidence of such factors sufficient to support the verdicts against the crew members.
 
 
 27
 To sustain the convictions on the alleged violation of section 955a(a), we must be satisfied that the government proved beyond a reasonable doubt that the appellants knowingly or intentionally possessed marijuana with intent to distribute it while on board a vessel subject to the jurisdiction of the United States on the high seas. To sustain the convictions on the alleged conspiracy, we must be satisfied that the government proved beyond a reasonable doubt that "a conspiracy existed, that the accused knew it and, with that knowledge, voluntarily joined it," United States v. Luis-Gonzalez, 719 F.2d 1539 (11th Cir.1983), with the object of violating section 955a(a). Circumstantial evidence may be used to support the verdicts.
 
 
 28
 In Cruz-Valdez, we listed several aspects of the recurrent fact patterns in cases involving marijuana laden vessels which this court has recognized as constituting situations in which an inference of guilt can give rise to evidence sufficient to support proof beyond a reasonable doubt. We identified one factor as having received particular attention in our cases--the quantity of marijuana on board a vessel. Although there was a large amount of marijuana on board the MRS. WHITE, we nevertheless conclude that this fact simply is not a controlling factor in the instant case in light of the totality of the circumstances presented. In Cruz-Valdez we explained that a large quantity of marijuana was a significant factor for two reasons--first, "under most circumstances large quantities of contraband on a small vessel make it most unlikely that the persons on board will be ignorant of its presence"; and second, "it is highly improbable that drug smugglers would allow an outsider on board a vessel filled with millions of dollars worth of contraband." 773 F.2d at 1546. This rationale was appropriate in Cruz-Valdez where more than 8,000 pounds of marijuana was found in an unlocked hatch on a sixty-eight foot shrimp trawler whose fishing gear was rusted and inoperable and on which no evidence of legitimate fishing efforts was found. In the case of the MRS. WHITE, however, the first rationale is undermined by several other facts--the MRS. WHITE is a large, 156-foot freighter on which there was a sizeable quantity of a legitimate cargo of cement and lumber, and more importantly, the marijuana on board was secreted in tightly sealed compartments which emitted at most a negligible odor not detected by several Coast Guard officers trained in searching for contraband, and detected by one officer only after standing near the sealed vent leading to the compartment for more than an hour. This fact situation does not lend itself to an inference that all persons on the vessel necessarily knew of the presence of the marijuana. The evidence did not establish "that a large quantity of contraband was in plain view or could be smelled or was in a place where a person on a vessel would ordinarily discover it." 773 F.2d at 1546. In apparent recognition of the fact that the marijuana was so well sealed that a crew member would not ordinarily have seen it or smelled it, the government attempted at trial to establish that a crew member on board would ordinarily have known of its presence for other reasons. These attempts failed.[11] After reviewing the entire record in this case we conclude that there simply was not evidence to permit a jury to reasonably infer that the presence on board of this large quantity of marijuana would ordinarily have been known to the crew.
 
 
 29
 The second rationale supporting the emphasis on the "large quantity factor" in Cruz-Valdez is premised on the inference from the first--because persons boarding the vessel would become aware of the presence of the marijuana, the owners of the contraband would not risk allowing an outsider on board along with such a valuable quantity. If the first rationale is not supported and in fact discovery of the presence of the marijuana by unknowing persons boarding the vessel is, as in this case, highly unlikely, then the second rationale for inferring participation is not compelling because the risk arising from a highly unlikely occurrence is minimal. The Coast Guard boarding party's difficulty in discerning even the existence of the hidden compartments on the MRS. WHITE, their need to refer to the blueprints, the lengthy and complicated procedures necessary to gain access to the forward compartment, and the necessity of procuring a drill from the Coast Guard vessel to gain access to the aft compartment, substantiate our conclusion that the large quantity of marijuana alone is not a highly significant factor in the instant case against the crew members.[12]
 
 
 30
 Even though the "large quantity factor" is not as significant a consideration in this case as in Cruz-Valdez, it is still one factor to consider in our examination of the totality of the circumstances. In Cruz-Valdez, we held that in cases where the evidence indicates that the large quantity of marijuana on a vessel is highly significant, the government's burden to prove participation in a conspiracy to possess and possession is relatively light after the existence of the large quantity has been established. In the instant case, where the large quantity of marijuana is of less significance, the government's remaining burden is heavier and we require a greater amount of additional evidence. We decide this case without focusing on the comparative weight of these burdens, however, because of the total lack of additional evidence in the case against the MRS. WHITE crew members. The additional evidence here would likely fail to meet the standard even in the Cruz-Valdez situation, and is certainly fatal in the instant case.
 
 
 31
 In Cruz-Valdez, our list of factors that could provide the necessary additional support included: a long voyage on a small vessel evincing a close relationship between captain and crew; suspicious behavior or diversionary maneuvers before apprehension; attempts to flee; inculpatory statements made after apprehension; witnessed participation as a crewman; obviousness of the contraband; or absence of equipment necessary to the intended use of the vessel. There was no evidence of any of these factors in the trial evidence against the MRS. WHITE crew members.[13] Unlike Cruz-Valdez where the four defendants found on the vessel shared one main cabin in which the living quarters and galley were located, there was no evidence of a close relationship between the seven MRS. WHITE crew members and the captain. There was no direct evidence of the length of the voyage although one witness testified that it would have taken the MRS. WHITE approximately nine days to go directly from Baranquilla to the point where the Coast Guard met it. The vessel in this case was not a small fishing vessel, however, but rather a large cargo ship on which the crew members berthed in a separate compartment from the captain's quarters. The MRS. WHITE crew members fully cooperated with the Coast Guard exhibiting no suspicious behavior or diversionary maneuvers. The MRS. WHITE did not attempt to elude the Coast Guard, but rather granted the Coast Guard permission to board and perform all searches. None of the crew members made inculpatory statements.[14] Although the crew members were identified by the vessel's passenger list as crew, there was no evidence that they participated in the loading of the contraband. To the contrary, after the vessel was seized, the Coast Guard team searched the crew's quarters and personal belongings for marijuana residue but found none. They tested for marijuana residue on some articles of clothing and on a bedsheet taken from the crew quarters and obtained negative results. The Coast Guard had found a welding outfit on the aft end of the vessel, but no evidence was presented as to whose it was or if any of the seven crew was trained in welding. As noted above, the contraband was far from obvious, the vessel was in proper working order for a freighter, and was in fact being used as such.
 
 
 32
 After considering the totality of the circumstances in this case, we conclude that if a jury had given the crew members' cases individualized consideration on the evidence presented at trial, and had applied the correct legal standards, it necessarily would have entertained a reasonable doubt as to their guilt. We must, therefore, reverse their convictions.
 
 CONCLUSION
 
 33
 We hereby AFFIRM the conviction of Alava-Solano, and REVERSE the convictions of Vidal-Hungria, Castro-Lahoz, Robinson-Vasquez, Meza-Castillo, Galvis-Diaz, Ferreira-Navas, and Aaron-Pinto.
 
 
 
 *
 Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 The seven crew members all present the identical claim on appeal. They all rely on the arguments presented in the brief filed on behalf of Vidal-Hungria, Castro-Lahoz, and Robinson-Vasquez. This court granted the motion of appellants Meza-Castillo, Galvis-Diaz, Ferreira-Navas, and Aaron-Pinto to adopt that brief. At oral argument, the crew members claims were considered together. Alava-Solano appeals through separate counsel and submitted his case to this court on brief without oral argument
 
 
 [2]
 Section 955b explains that Secs. 955a to 955d incorporate the definition of "customs waters" contained in 19 U.S.C. Sec. 1401(j) which states:
 (j) The term "customs waters" means, in the case of a foreign vessel subject to a treaty or other arrangement between a foreign government and the United States enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon such vessel upon the high seas the laws of the United States, the waters within such distance of the coast of the United States as the said authorities are or may be so enabled or permitted by such treaty or arrangement and, in the case of every other vessel, the waters within four leagues of the coast of the United States.
 
 
 [3]
 Alava-Solano devotes much of his brief to developing the manner in which the true status of the MRS. WHITE was discovered. In short, the record indicates that his attorney became suspicious that the British registry of the vessel might not be valid when the government disclosed to her, pursuant to a standing discovery order, the paperwork seized from the MRS. WHITE. In that paperwork Alava-Solano's lawyer found a Terminable Certificate of Registration issued by the Registrar for shipping of the British Virgin Islands dated March 23, 1984, granting the MRS. WHITE permission to operate as a cargo vessel between the British and United States Virgin Islands, the Commonwealth of Puerto Rico and other eastern Caribbean countries. She also found, however, a detailed bill of sale dated April 6, 1984, indicating the sale of the vessel from a British Virgin Island corporation to an individual in Venezuela. She began investigating the effect of a sale on the validity of the registry and eventually reached by telephone the Registrar of Shipping for the British Virgin Islands who had issued the Terminable Certificate. He told her that on the day of the boarding the registration was invalid both because the vessel had been sold to a non-British citizen and because the vessel was operating outside of the geographical limits of the certificate. Alava-Solano's attorney requested that a public document to this effect be prepared for trial use and stated that someone could be sent to pick it up. She was told by the British Virgin Island official that such a document had already been sent to the United States Coast Guard in Miami, Florida, on August 10, 1984, pursuant to their request. Alava-Solano's attorney therefore knew that the government would have to prove the custom waters element of the indictment by some evidence other than the Terminable Certificate. She also believed that the government breached its duty under Brady by not disclosing this
 Alava-Solano reasserts this charge of a Brady violation in this appeal. The government counters by arguing that the Coast Guard received the documents on August 20, after Alava-Solano filed his Brady request, and that it informed the court of the documents when the court reconvened. Alava-Solano contends that subsequent evidence indicates that the government had received the information even earlier. We do not address this Brady issue in this proceeding because it arises out of case number 84-371-Cr-JE. Appellants here appeal only from case number 84-0558-Cr-Atkins. The claim is not properly before this court.
 
 
 [4]
 Alava-Solano filed a timely pre-trial motion to dismiss on double jeopardy grounds in the district court. In the written order dated December 5, 1984, denying the motion, the district court denied a stay noting that the trial was already in progress and stated that the motion could be reviewed with an appeal on the merits. On December 6, this court denied Alava-Solano's petition for writ of mandamus and petition for stay of proceedings in the district court
 
 
 [5]
 The double jeopardy clause of the fifth amendment provides:
 [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb....
 U.S. Const. amend. V.
 
 
 [6]
 The trial court at the proceeding on the first indictment did not enter any order other than the termination of the case until more than a year later when, on September 24, 1985, the trial court granted the Rule 29 motion and entered a judgment of acquittal. The second trial which is the source of this appeal had been completed by that time. Both parties treat the trial court's termination of the case as an acquittal, however, for purposes of this appeal. Although the government apparently contended at the time of the termination of the first indictment proceeding that the case should be dismissed on jurisdictional grounds, it has not presented that argument in this case undoubtedly in recognition of the fact that the district court was precluded from dismissing the case for lack of jurisdiction by our opinion in United States v. Luis-Gonzalez, 719 F.2d 1539, 1546 (11th Cir.1983) (en banc), wherein we held that subsections (a) through (d) of Sec. 955a did not "merely establish separate criteria by which jurisdiction of vessels on the high seas may be obtained." Proof of the status of the vessel described in each subsection is a material element of each offense. See also United States v. Julio-Diaz, 678 F.2d 1031 (11th Cir.1982). Because we conclude that the second indictment charges offenses distinct from those in the first, we need not address the technical status of the termination of the case. We note, however, that treating the trial court's termination of the case as a dismissal with prejudice would also bar the government from reindicting or trying Alava-Solano for the same charges. United States v. Stricklin, 591 F.2d 1112, 1120 (5th Cir.), cert. denied, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979)
 
 
 [7]
 21 U.S.C. Sec. 955a provides in relevant part:
 (a) It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.
 (b) It is unlawful for a citizen of the United States on board any vessel to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.
 (c) It is unlawful for any person on board any vessel within the customs waters of the United States to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.
 (d) It is unlawful for any person to possess, manufacture, or distribute a controlled substance--
 (1) intending that it be unlawfully imported into the United States; or
 (2) knowing that it will be unlawfully imported into the United States.
 
 
 [8]
 21 U.S.C. Sec. 955c provides:
 Any person who attempts or conspires to commit any offense defined in sections 955a to 955d of this title is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
 
 
 [9]
 The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [10]
 The crew members all made unsuccessful motions for acquittal at the close of the government's case which were renewed at the close of all the evidence and denied
 
 
 [11]
 The government attempted to elicit testimony that a crew member would necessarily be aware of such a large amount of cargo because of the effect of the weight on the stability of the vessel. The government's own witness, Amidon, testified, however, that there was no problem with the stability of the MRS. WHITE during the twenty-four hours he spent on board, and that in his opinion someone on board would not have known of the hidden cargo based on the stability of the vessel. Another member of the boarding party, Fulcher, testified that the vessel was trimmed aft, as most vessels normally are, although in his opinion this vessel was trimmed more aft than normal. On cross-examination he stated that responsibility for the trim was the Captain's. He also conceded that the vessel could be considered stable
 The government attempted to establish that anyone who had been responsible for the sounding tubes would have detected the odor of the marijuana. The government presented absolutely no evidence as to which of the seven crew members was assigned this task. Furthermore, Fulcher testified that he smelled the marijuana in only one of the tubes, and only after leaning over to smell the tube--an effort not necessary to perform the sounding.
 The government tried to establish that the bag covering the vent and a pad-eye and hand-hold welded inside the paint locker would have raised the suspicions of a crew member. The testimony established, however, that although those who loaded the vessel may have needed to work around the vent area, the ship could be operated properly by the crew without any of them ever needing to go up to the vent or immediate surrounding area. We further note that even if a crew member became suspicious at some time during the voyage, the difficulty of gaining access to the compartment containing the marijuana counters any inference that his suspicions could have been verified. In any event, an inference that the vent and paint locker were obviously suspicious is unsupportable where, as here, Coast Guard members trained in detecting hidden contraband did not regard the vent or paint locker as suspicious when they viewed them on their initial search of the vessel.
 
 
 [12]
 We note that the "large quantity factor" is much more significant in the government's case against Alava-Solano, the acknowledged captain of the vessel. The government presented testimony at trial to the effect that it is the captain's responsibility to determine the amount of fuel needed, the proper distribution of ballast, and the safe storage of the cargo, all of which would necessitate knowing of the existence of a large weight of cargo below deck. The case against Alava-Solano also was of a different caliber than that against the crew because of Alava-Solano's inquiry to Plaza as to whether the Coast Guard had found marijuana. Alava-Solano does not challenge the sufficiency of the evidence supporting his convictions
 
 
 [13]
 Although not listed as a factor in evidence in the other marijuana vessel cases we have reviewed, the government in this case entered into evidence certified copies of a prior conviction for each of two of the crew members Ferreira-Navas and Galvis-Diaz. The court gave the proper limiting instruction to the jury informing them that it was not evidence that a similar act was done at a different time, but could be used to determine the state of mind or intent of one who had been found, beyond a reasonable doubt, to have committed an act charged. In this case where there was necessarily a reasonable doubt as to whether any of the seven crew knew of the presence of the sealed compartments or their contents, this evidence cannot affect the disposition of their claims. In other cases where the presence of the contraband is apparent, this would be a relevant factor to weigh
 The government submitted no evidence of any investigation into fingerprints in either of the hidden compartments. It made no distinctions between the seven crew members' ability to do welding or fit into the welding outfit, nor did it clarify which of the crew would have been positioned in the bow to work, or which had the responsibility to do the soundings. The government did not even establish where or when the crew members came aboard.
 
 
 [14]
 Any imputation to the crew members of Alava-Solano's statement is prohibited as a matter of law. Only if a conspiracy is found to exist can an individual's statement then be imputed to other coconspirators. This is true of course only of statements made in furtherance of the conspiracy. It is doubtful that Alava-Solano's comment made after the boarding by the Coast Guard and his placement under the watch of Seaman Plaza could be classified as such, and not as having been made after the alleged conspiracy had ended. Furthermore, as a matter of fact in this case, the captain and crew members were kept apart throughout the search and the captain's statement made no reference to the crew